**IN THE UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF ARKANSAS
WESTERN DIVISION**

RONDA DEPRIEST                                                                PLAINTIFF

v.                                      No. 4:12-cv-00235 KGB

DENNIS MILLIGAN                                                            DEFENDANT

<u>**OPINION AND ORDER**</u>

     Defendant Dennis Milligan, individually and in his official capacity, filed a motion for summary judgment (Dkt. No. 51), to which plaintiff Ronda DePriest has responded (Dkt. No. 64).  Mr. Milligan has replied (Dkt. No. 70).  Ms. DePriest has filed a motion to stay and motion to remand (Dkt. No. 59), to which Mr. Milligan has responded (Dkt. No. 70).  For the following reasons, the Court grants in part and denies in part Mr. Milligan's and Ms. DePriest's motions.

     **I.**     **Factual Background**

     Dennis Milligan, a Republican, ran for Saline County Circuit Clerk in 2010 and won.  He opposed the long-time incumbent clerk, Doug Kidd, a Democrat.  Ms. DePriest, an at-will employee, was employed as chief deputy under Mr. Kidd's administration.  Mr. Milligan did not know Ms. DePriest when he was elected.  Prior to assuming office on January 1, 2011, Mr. Milligan notified Ms. DePriest that she would not be retained as chief deputy.  Although Ms. DePriest does not dispute this, she contends that she would have stepped down to a lower position to remain an employee and not lose her seniority, sick leave, and vacation leave.  She alleges in her complaint that she was not retained because she refused to support Mr. Milligan in the campaign (Dkt. No. 20, ¶7).  She contends in response to the motion for summary judgment that Mr. Milligan told her on Facebook that he fired her because of comments she had made on Facebook (Dkt. No. 59-1, ¶6).  Mr. Milligan disputes this.

Mr. Milligan hired a person of his choosing, Jim Harris, to be his chief-of-staff.   Ms. DePriest claims that Mr. Harris had no prior experience in running the Saline County Circuit Clerk's office.   Mr. Milligan claimed in his deposition that he hired the individual he felt would be best to help him fulfill the promises that he made to the citizens of Saline County. Mr. Milligan claims he chose not to reappoint Ms. DePriest as the chief deputy because he viewed the position as one that requires political loyalty.   Ms. DePriest disputes that the chief deputy position requires political loyalty (Dkt. No. 59-1, ¶9).

Ms. DePriest contends that Mr. Milligan did not hire her because she is female and supported Mr. Kidd.   She also claims that, at present, Mr. Milligan refuses to consider her for employment because she has filed a lawsuit, even if she is the best qualified candidate (Dkt. No. 59-1, ¶8).   She claims that Mr. Milligan refuses to hire her, despite knowing nothing about her.

Ms. DePriest testified in her deposition that she never called Mr. Milligan and asked him if he would hire her back in some other position.   She claims that to do so would have been futile because she had filed a lawsuit (Dkt. No. 59-1, ¶12).   To Mr. Harris's knowledge, Ms. DePriest has not applied for any other job at the circuit clerk's office since Mr. Milligan was elected. Although she admits this, Ms. DePriest maintains that applying would have been futile because Mr. Milligan would not have hired her (Dkt. No. 50-1, ¶13).   Ms. DePriest contends that, at the time she was terminated, she was not interviewed or allowed to apply for any other positions in the Saline County Circuit Clerk's office.   She maintains that, had she been allowed to do so, she would have continued working there.   She also claims that the job given to Gary Underwood was not posted, and she had previously performed all aspects of that job.

According to Mr. Milligan, anytime he hires a full-time employee, he advises Christy Peterson in the County's human resources department that a position is open, and they "let the

system run its course" before he decides who to hire.  Part-time positions may or may not be posted.  Mr. Milligan explained that he tells Ms. Peterson what the job is and follows her recommendation regarding whether to advertise or not.  Ms. DePriest disputes that Mr. Milligan goes to Ms. Peterson with every hiring decision; she claims Mr. Milligan alone made the decision to terminate her and continues to refuse to hire her (Dkt. No. 59-1, ¶15).

At the end of 2010, all of the employees in the Saline County Circuit Clerk's office were women.  Mr. Milligan maintains that he does not consider race or gender in his hiring decisions; Ms. DePriest disputes this (Dkt. No. 59-1, ¶18).

Ms. DePriest contends that Mr. Harris does not perform the same duties she performed, but is "completely different" from the job she performed (Dkt. No. 59-1, ¶29).  Ms. DePriest cites the supervision of all records and checking their accuracy as examples of duties she once performed that are now performed by other deputy clerks (Dkt. No. 59-1, ¶29).  Mr. Harris's duties, on the other hand, include helping Mr. Milligan write speeches that Mr. Milligan has to deliver and acting as Mr. Milligan's "overall ambassador" in the community.  When Mr. Harris is off the clock, he attends political events for Mr. Milligan and promotes changes that Mr. Milligan has made in the Circuit Clerk's Office.  Mr. Milligan consults with Mr. Harris regarding political matters and values Mr. Harris's political insight and counsel, based on Mr. Harris's experience in the political arena.  Mr. Harris also advises Mr. Milligan on hiring, firing, and disciplining employees.  Mr. Harris interviews potential staff members during the hiring process. Mr. Milligan has designated Mr. Harris as his representative to attend meetings on his behalf sponsored by the Arkansas Association of Counties, the Arkansas Circuit Clerk's Association, and the Administrative Office of the Courts.  Mr. Harris is Mr. Milligan's primary contact with other constitutional offices in the state, including the Governor's Office, the State Auditor, the

State Treasurer, the State Land Commissioner, and all state agencies that interact with the Circuit Clerk's Office.  Mr. Milligan has also appointed Mr. Harris as his liaison with the press, and Mr. Harris, at Mr. Milligan's direction, prepares press releases regarding Mr. Milligan's accomplishments of his campaign pledges and of changes, developments, and improvements within the Circuit Clerk's Office.  Mr. Harris also handles any special projects Mr. Milligan wants him to put together.  Mr. Harris's everyday responsibilities include dealing with any customer complaints, managing the office staff, and generally overseeing the Circuit Clerk's office.  Mr. Harris claims he is totally responsible for the day-to-day operations of the office. Mr. Harris continues to perform other daily tasks that Ms. DePriest performed when she was chief deputy such as making deposits, handling payroll, managing personnel records, and dealing with employee leave.  Mr. Milligan claims he expects Mr. Harris to do whatever he demands or needs from him, 24 hours a day.

Mr. Milligan contends he appointed Mr. Harris because he knew Mr. Harris personally and wanted someone he could trust to act on his behalf in his absence.  Ms. DePriest denies that the position she held was a position of "trust" (Dkt. No. 59-1, ¶31).

Ms. DePriest filed a charge with the Equal Employment Opportunity Commission ("EEOC") prior to filing this lawsuit.  The right-to-sue letter Ms. DePriest received from the EEOC states:  "The EEOC issues the following determination:  Based upon its investigation, the EEOC is unable to conclude that the information obtained establishes violations of the statutes. This does not certify that the respondent is in compliance with the statutes.  No finding is made as to any other issues that might be construed as having been raised by this charge."  (Dkt. No. 52-5).

## II.     Standard

Summary judgment is proper if the evidence, when viewed in the light most favorable to the nonmoving party, shows that there is no genuine issue of material fact and that the defendant is entitled to entry of judgment as a matter of law.  Fed. R. Civ. P. 56;  *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986).  A factual dispute is genuine if the evidence could cause a reasonable jury to return a verdict for either party.  *Miner v. Local 373*, 513 F.3d 854, 860 (8th Cir. 2008). "The mere existence of a factual dispute is insufficient alone to bar summary judgment; rather, the dispute must be outcome determinative under the prevailing law."  *Holloway v. Pigman*, 884 F.2d 365, 366 (8th Cir. 1989).  However, parties opposing a summary judgment motion may not rest merely upon the allegations in their pleadings.  *Buford v. Tremayne*, 747 F.2d 445, 447 (8th Cir. 1984).  The initial burden is on the moving party to demonstrate the absence of a genuine issue of material fact.  *Celotex Corp.*, 477 U.S. at 323.  The burden then shifts to the nonmoving party to establish that there is a genuine issue to be determined at trial.  *Prudential Ins. Co. v. Hinkel*, 121 F.3d 364, 366 (8th Cir. 2008).  "The evidence of the non-movant is to be believed, and all justifiable inferences are to be drawn in his favor."  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986).

## III.     Analysis

As a general matter, at-will public employees have no property right in their jobs, nor are constitutional rights affected by their firing without cause, except in certain circumstances.  Here, although Ms. DePriest concedes she was an at-will public employee, she contends her firing without cause violated her First Amendment and Fourteenth Amendment Equal Protection rights.

A.      **First Amendment Claim**

Ms. DePriest alleges a claim for retaliatory discharge in violation of 42 U.S.C. § 1983. To establish a *prima facie* case of retaliation under the First Amendment, a plaintiff must show that her conduct was constitutionally protected and that the protected conduct was a substantial or motivating factor in the defendant's adverse action.  *McCullough v. Univ. of Ark. for Med. Scis.*, 559 F.3d 855, 865 (8th Cir. 2009) (citing *Altonen v. City of Minneapolis*, 487 F.3d 554, 559 (8th Cir. 2007); *Cox v. Dardanelle Pub. Sch. Dist.*, 790 F.2d 668, 672-76 (8th Cir. 1986)).  If plaintiff makes out a *prima facie* case, the burden shifts to defendant to show that it would have taken the same action regardless of plaintiff's protected speech.  *Id.* (citing *Altonen*, 487 F.3d at 559); *see Mt. Healthy City Sch. Dist. Bd. of Educ. v. Doyle*, 429 U.S. 274, 287 (1977).

Here, Ms. DePriest asserts she was terminated for engaging in constitutionally protected speech or for refusing to speak.  For a public employee to make out a claim for retaliatory discharge based on protected speech, she must demonstrate that the speech involved a matter of public concern, that the interest of the employee as a citizen in commenting upon matters of public concern outweighs the employer's interest in promoting the efficiency of the public services it performs through its employee.  *Connick v. Myers*, 461 U.S. 138, 142 (1983) (quoting *Pickering v. Bd. of Ed. of Twp. High Sch. Dist. 205, Will Cnty., Illinois*, 391 U.S. 563, 568 (1968).

"Whether an employee's speech addresses a matter of public concern must be determined by the content, form and context of a given statement, as revealed by the whole record." *Connick*, 461 U.S. at 147–48.  If the speech at issue relates to a matter of public concern, the court must next employ the balancing test outlined in *Pickering v. Board of Education* to

determine if plaintiff's speech interests outweigh the efficiency interests of her government employer.

However, the Supreme Court's decision in *Elrod v. Burns*, 427 U.S. 347 (1976), as modified in *Branti v. Finkel*, 445 U.S. 507 (1980), created an exception to the *Pickering* rule. The First Amendment issue in this case arises from that exception.  In those cases, the Supreme Court concluded that political patronage dismissals impinge upon a public employee's First Amendment rights of speech and association and held that a dismissal solely on account of an employee's political affiliation violates the First Amendment unless "the hiring authority can demonstrate that party affiliation is an appropriate requirement for the effective performance of the public office involved."  *Branti*, 445 U.S. at 518.  More recently, the Supreme Court has summarized *Elrod* and *Branti* as standing for the proposition that "[g]overnment officials may not discharge public employees for refusing to support a political party or its candidates, unless political affiliation is a reasonably appropriate requirement for the job in question."  *O'Hare Truck Service Inc. v. City of Northlake*, 518 U.S. 712, 714 (1996).  In other words, a "government's interest in securing employees who will loyally implement its policies can be adequately served by choosing or dismissing certain high-level employees on the basis of their political views."  *Rutan v. Republican Party of Illinois*, 497 U.S. 62, 74 (1990).

"The question whether party affiliation or political loyalty is an appropriate requirement often turns on the extent to which the position involves policy-making or a confidential relationship with an elected official."  *Langley v. Hot Spring County, Arkansas*, 393 F.3d 814, 817 (8th Cir. 2005).  The Eighth Circuit has found personal loyalty to be an appropriate requirement where the individual reports directly to the chief executive and his duties include public relations and long-range planning.  *See Johnson v. City of West Memphis*, 113 F.3d 842,

844 (8th Cir. 1997).    The nature of an employee's responsibilities is a critical factor in categorizing that employee.   An employee with responsibilities that are not well-defined or are of broad scope or one who acts as an advisor or formulates plans for implementing broad goals is more likely to function as a policy maker.   *Elrod*, 427 U.S. at 367.   If an employee has influence on important policy decisions made by the elected official, it is beyond serious question that the position is a policy-making position and that political loyalty to the elected official is necessary. *Langley*, 393 F.3d at 818.

Here, the parties agree that the position Ms. DePriest held changed when Mr. Milligan took office.    When Ms. DePriest was chief deputy, she claims she had no political responsibilities.   Mr. Milligan acknowledges that she "oversaw the real estate office and had other non-political responsibilities" (Dkt. No. 53, at 7).    When Mr. Milligan took office, however, he claims he envisioned the position of chief deputy as more of a chief of staff and political advisor position—"a position of trust rather than one clerical in nature" (Dkt. No. 53, at 7).   Ms. DePriest agrees that Mr. Harris does not perform the same duties she performed (Dkt. No. 59-1, ¶29).   She contends that his job is "completely different" from the job she performed (Dkt. No. 59-1, ¶29).   Ms. DePriest also denies that the position she held was a position of "trust" (Dkt. No. 59-1, ¶31).

This Court concludes, based on the record as a whole, that the chief deputy position was a position of trust and that, under Mr. Milligan, it became a policy-making position.   The Court concludes the *Elrod-Branti* exception to the *Pickering* rule applies.   Mr. Milligan's termination of Ms. DePriest because she failed to support his candidacy did not violate her First Amendment rights.    The Court acknowledges Ms. DePriest's insistence that Mr. Milligan told her on Facebook that he fired her because of comments she purportedly made on Facebook.   Ms.

DePriest, however, never identifies the posts or statements Mr. Milligan allegedly attributed to her and upon which she claims he fired her.  The only post by Ms. DePriest referred to in the record is a post made after her termination by Mr. Milligan.  These allegations do not alter this Court's analysis of Ms. DePriest's First Amendment claim.  Mr. Milligan is entitled to summary judgment in his favor on Ms. DePriest's First Amendment claim.

### B.     Gender Discrimination Claim

Ms. DePriest also alleges a gender discrimination claim.  She contends that Mr. Milligan terminated her, replaced her by a lesser qualified male, and did not permit her to reapply for open positions because of her gender in violation of the Equal Protection Clause made applicable through 42 U.S.C. § 1983; Title VII, 42 U.S.C. § 2000e *et seq*.; and the Arkansas Civil Rights Act (the "ACRA"), Ark. Code Ann. § 16-123-101 *et seq*.  She also alleges a violation of the Government Employee Rights Act of 1991 (the "GERA"), 42 U.S.C. §§ 2000e(f), 2000e-16c.

The GERA is an alternate remedy to Title VII provided by Congress for employees in positions of trust.  The GERA provides that all personnel actions affecting qualified employees shall be made free from any discrimination based on the basis of race, color, religion, sex, national origin, age, or disability.  42 U.S.C. § 2000e-16c.  The GERA further provides that the rights, protections, and remedies provided under the GERA apply with respect to employment of any individual chosen or appointed by a person elected to public office in any state or political subdivision of the state by the qualified voters thereof to serve the elected official on the policy-making level.  *Id.*  Claims under the GERA first must be reviewed by the EEOC before they can be judicially reviewed.  *Id.*  Having determined that Ms. DePriest held a position of trust on the Saline County Circuit Clerk's staff, this Court determines that it must stay the action with no

further consideration of Ms. DePriest's gender discrimination claims at this time, pending further action by the EEOC consistent with the GERA.

Because Ms. DePriest was a member of the Saline County Circuit Clerk's personal staff, she was not an "employee" under Title VII. *See* 42 U.S.C. § 2000e(f). Instead, Ms. DePriest must pursue remedies under the GERA and its administrative and judicial process. *See Crain v. Butler*, 419 F.Supp. 2d 785, 788 (E.D.N.C. 2005) (examining factors to determine whether an employee is covered by Title VII or the GERA). The Court acknowledges that Ms. DePriest presented a notice of right to sue issued by the EEOC before filing the current action. That notice with the language it includes, however, is not sufficient under the GERA. *See Stitz v. City of Eureka Springs, Arkansas*, 9 F.Supp.2d 1046, 1056 (W.D. Ark. 1998). As one court has explained:

> Under the GERA, the administrative procedures are quite different than those delineated under Title VII. Under the GERA, once a proper complaint has been filed with the EEOC, the Commission must determine whether a violation has occurred and issue a final order in accordance with the procedures set forth in the Administrative Procedure Act, 5 U.S.C. §§ 554-57. 2 U.S.C. § 1220(b)(1). At that point, "any party aggrieved by a final order" can obtain judicial review pursuant to 28 U.S.C. § 158. 2 U.S.C. § 1220(c). Consequently, the charging party must "await a determination by [the EEOC] prior to initiating legal action." *McNulty v. New York City Dep't of Finance*, 941 F.Supp. 452, 457 (S.D.N.Y. 1996). Although plaintiffs may seek review in the federal district court once the EEOC has made a determination, *de novo* review is unavailable. *Id.*

*Guy v. State of Illinois*, 958 F.Supp. 1300, 1306 (N.D. Ill. 1997). Like the court in *Guy*, however, this Court declines to order the EEOC to hear again or conduct further proceedings in the present case. *Id.* at 1306–07. Ms. DePriest's argument that the EEOC should take further action with regard to Ms. DePriest's GERA claim is more properly addressed to the EEOC itself. Therefore, the Court stays this matter to allow Ms. DePriest to refile her EEOC complaint to allege a GERA violation and to obtain the proper administrative relief under the GERA. Further,

the Court notes that, because Ms. DePriest properly invoked the EEOC's jurisdiction in a timely fashion and that the EEOC failed to determine that the charge should have been resolved in accord with the GERA, principles of equity apply to toll the running of the statute of limitations on this GERA claim.  *See Dyer v. Radcliffe*, 169 F.Supp. 2d 770, 775–76 (S.D. Ohio 2001).

The Court acknowledges that Ms. DePriest brings gender discrimination claims under the Equal Protection Clause as made applicable by 42 U.S.C. § 1983 and under the ACRA.  Courts do not agree on the interplay between § 1983 and the GERA.  *Compare Dyer*, 169 F.Supp. 2d at 777 (determining that the GERA is the exclusive remedy and that employees covered by the GERA have no independent § 1983 right), *with Stubblefield v. City of Jackson, Mississippi*, 871 F.Supp. 903, 911 (S.D. Miss. 1994) (determining that the GERA does not provide an exclusive remedy and examining race discrimination claims under § 1983).  The parties in the instant case did not brief this issue.  At this time, the Court declines to reach the issue.  The Court construes Ms. DePriest's request for a stay as a request for this Court to stay consideration of all her gender discrimination claims at this time.  The Court grants that request.  If the parties desire this Court to proceed in evaluating her gender discrimination claims under § 1983 or the ACRA, the parties may file a motion requesting the Court do so.

### C.    Right to Remonstrate Claim

Ms. DePriest also contends that her termination violates the Arkansas Constitution by infringing on her right to remonstrate.  Ark. Const. art. II, §4 ("The right of the people peaceably to assemble, to consult for the common good; and to petition, by address or remonstrance, the government, or any department thereof, shall never be abridged.").

Ms. DePriest contends that the Arkansas Constitution creates a specific "right to remonstrate" and that this right is something different from the right to free speech and the right

11

to petition the government for redress of grievances because both the terms "remonstrate" and "petition" are found in the Arkansas Constitution and, therefore, "petition" must mean something different than "remonstrate." *See, e.g., Sykes v. Williams*, 283 S.W.3d 209, 215 (2008) ("This court construes statutes so that no word is left void, superfluous, or insignificant."). Ms. DePriest argues that the "remonstrate" language in the Arkansas Constitution confers a right on each citizen to object to, to protest, or to oppose an officer's course of action, and to bring a lawsuit if the officer attempts to retaliate against a citizen for exercising this right.

Mr. Milligan contends the word "remonstrance" is synonymous with the term "petition" and confers no additional rights beyond those protected by the First Amendment to the United States Constitution. Mr. Milligan argues that "remonstrate" denotes a meaning of "petition" because the phrase "by address or remonstrance" modifies the phrase "to petition" in the Arkansas Constitution. *See* Ark. Const. art. II, §4.

The Court will not resolve this dispute. The "right to remonstrate" as Ms. DePriest understands it was not clearly established in late 2010 or early 2011 when the acts she complains of allegedly occurred and is not clearly established now, so Mr. Milligan is entitled to qualified immunity on this claim. *Simons v. Marshall*, 255 S.W.3d 838, 842 (Ark. 2007); *Fegans v. Norris*, 89 S.W.3d 919, 924 (Ark. 2002). Therefore, Mr. Milligan's motion for summary judgment on Ms. DePriest's right to remonstrate claim is granted.

\* \* \*

For these reasons, the Court grants Mr. Milligan's motion for summary judgment as to Ms. DePriest's First Amendment and right to remonstrate claims, dismissing with prejudice those claims, and denies his motion without prejudice as to Ms. DePriest's gender discrimination claims for the reasons specifically stated in this Order (Dkt. No. 51). The Court grants Ms.

DePriest's motion to stay this matter for further proceedings consistent with the GERA (Dkt. No. 59).

The Court notes that there are several outstanding discovery motions pending in this matter.  Given that this matter is hereby stayed and remanded, the Court denies without prejudice at this time all outstanding, pending discovery motions (Dkt. Nos. 26, 29, 30, 33).  The parties may refile these discovery motions, if appropriate, when the stay is lifted in this matter.

The parties shall have 90 days from the conclusion of any additional EEOC proceedings or any final action by the EEOC to request this Court lift the stay or otherwise seek relief.

SO ORDERED this 30th day of September, 2013.

_____
Kristine G. Baker
United States District Judge